CULPEPPER, Judge.
The plaintiff, Harry Deshotels, seeks workmen’s compensation benefits for disabling blindness allegedly resulting from a nose injury received in the course of his employment by the defendant, Houston Contracting Company. From an adverse judgment, plaintiff appeals.
The issue on appeal is whether plaintiff sustained his burden of proving the loss of vision resulted from the nose injury.
Plaintiff was a member of a crew laying a pipeline. On the day in question, September 17, 1964, a heavy rain started and the men ran for shelter. Plaintiff was in a bending position when a fellow employee ran past. The fellow employee had a device, made from a welding rod and used to carry a claw hammer or other equipment, hanging from his belt. As he ran past, the end of the welding rod caught the end of plaintiff's nose, penetrating the right nasal septum and causing a laceration on the inside. It bled profusely, but plaintiff went home that night without seeking medical attention.
The next day, he went to see Dr. Harlie Bearden, a general practitioner in Jennings, Louisiana. This physician examined the laceration, which he estimated to extend from 1/2 inch to of an inch up inside the nose. He found the nose was swelled to about “half again its normal size” and was already infected. Antibiotics were prescribed for the infection and drugs for headaches.
Dr. Bearden referred plaintiff to Dr. Thomas J. Casanova, an ear, eye, nose and throat specialist in Crowley. He saw plaintiff on September 20, 1964 and recommended that after the infection and swelling subsided the injury be surgically repaired. Several weeks later Dr. Casanova performed a septectomy[1] which he considered satisfactory and which healed uneventfully.
It was in April of 1965, 6 or 7 months after the accident, that plaintiff first complained of loss of vision. Dr. Casanova examined the eyes on April 23, 1965 and found a loss of peripheral vision. The condition became progressively worse and finally Dr. Casanova diagnosed it as bilateral optic atrophy, progressive. By the time of trial, plaintiff had only “gun-barrel vision” and was disabled from work.
On December 9, 1965, plaintiff was examined by Dr. John Jackson, a neurosurgeon at Oschner’s Clinic in New Orleans. This physician confirmed the diagnosis of bilateral optic atrophy, resulting in almost total blindness.
As we stated above, the issue is causal relationship between the accident and the disabling blindness. None of the 3 doctors who examined plaintiff and testified in this case [2] could give an opinion that there *857 'was a causal relationship. Plaintiff relies on the rule which was recently stated in Gates v. Ashy Construction Company, 171 So.2d 742 (La.App., 3rd Cir. 1965) as follows:
“A claimant’s disability is presumed to have resulted from an accident, if (1) before the accident the injured person was in good health, hut (2) commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, (3) providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.” (Citations omitted)
Let us apply these three tests to the present case: (1) Plaintiff’s eyes were checked by a physician shortly before the accident and must be presumed to have been ‘‘in good health” at the time. (2) There is some question as to whether plaintiff’s optic atrophy “commenced with the accident”, for, as we stated above, plaintiff did not complain of loss of vision until 6 or 7 months after the accident. (3) However, even if we assumed that these first 2 requirements of the above stated rule of evidence have been met, the third is lacking, i. e., the medical evidence does not show a “reasonable possibility of causal connection between the accident and the disabling condition.”
Let us see exactly what the expert medical witnesses said about the possibility of a causal connection. Dr. Bearden, the treating physician, testified:
“In my opinion as far as his direct trauma causing an eye disability, I could see no connection whatsoever. If uveitis were instituted in the ophthalmic tract yia the infection of the nose, and this is possible from an infection in any area of the body, then an eye disability could result; but an uveitis would be apparent to any treating physician or any ophthalmologist especially, and if it did cause any uveitis, I’m sure that any eye doctor would have picked it up immediately.”
Dr. Casanova, on whom plaintiff principally relies, summarized his testimony as follows:
“Q So in summary, Doctor, I’m just going to ask you this one question about the possibility. Is there a reasonable medical possibility of a causal connection between this man’s original trauma and his present disability?
“A In my opinion the relationship of the injury to his nose and the optic atrophy that the man has coincided in such a manner that I feel that there is a remote possibility that there could he some bizzare connection between the two, but in spite of looking and looking, to date I’ve had no evidence to support my suspicion.”
Dr. Jackson, the neurosurgeon, testified:
“I can state from a neurological standpoint it would be really difficult for me to see how this injury could cause him to have optic atrophy or aggravate a condition that could cause optic atrophy. If he does have spinal fluid draining from his nose, it would be a very, very rare condition, but I think he needs further examination to determine this because the man is gradully getting blind.”
The following portion of Dr. Jackson’s testimony states some of the possible causes of optic atrophy:
“Q What normally causes optic atrophy ; doesn’t pressure of some sort cause that, sir?
“A Well, infection can cause it, just an inflammatory process without infection, demalinating diseases can cause it, different conditions inside of the eye ball which are out of my field and in the field of ophtalmology can cause optic atrophy. Some people are born with it, congenital *858 condition can cause it, tumors pressing on the optic nerves can cause it, increased pressure inside of the cranium can cause it and trauma can cause it; fractures of the bones around the optic nerves, a laceration of the optic nerve, and a few other less common things that can cause optic atrophy.”
In other parts of his testimony Dr. Jackson pointed out, as Dr. Casanova also did, that none of these normal causes of optic atrophy could be found in plaintiff’s case. The doctors simply were unable to find the cause and were unable to express an opinion that there was a reasonable medical possibility of a causal connection between the accident and the optic atrophy.
Our able brother below has very aptly stated our conclusion about this case, in the following from his written opinion:
“The Court has sympathy for the plaintiff in this case. There is no question but that he has a ‘double barrel’ vision, and in attempting to interpret the compensation law and the jurisprudence attendant thereto as liberally as possible in plaintiff’s favor, the Court could find no ‘rack to hang it’s hat on.’ The Court feels constrained to sorrowfully deny plaintiff’s claim. Plaintiff’s counsel is commended for the unusual efforts made on this client’s behalf in attempting to seek compensation for him.”
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the plaintiff appellant.
Affirmed.

. Removal of the bony wall that divides the nose into two parts.

. All three medical experts testified as witnesses for the plaintiff. The defendant did not call any physician to testify.